# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| AARON READ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 3:25-cv-01215 |
| v. | ) | Judge Crenshaw |
| | ) | Magistrate Judge Holmes |
| METRO. GOV'T. OF NASHVILLE | ) | JURY DEMAND |
| AND DAVIDSON COUNTY, | ) | |
| | ) | |
| Defendant. | ) | |

---

## FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT AND FIRST AMENDMENT RIGHTS

---

### INTRODUCTION

1.     This civil action arises under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 et seq., and 42 U.S.C. § 1983, to redress unlawful disability discrimination and retaliation, as well as retaliation for the exercise of Plaintiff's rights under the First Amendment to the United States Constitution, by the Defendant Metropolitan Government of Nashville and Davidson County ("Metro").

### JURISDICTION AND VENUE

4.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.S. § 1331 (federal question) and 28 U.S.C.S. § 1343(a)(4) (civil rights enforcement), because this action arises under the Americans with Disabilities Act of 1990, 42 U.S.C.S. §

12101 et seq. The enforcement provisions of the ADA adopt the procedures of Title VII, 42 U.S.C. § 2000e-5(f)(1)–(3), through 42 U.S.C. § 12117(a).

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the employment practices alleged herein occurred in the Middle District of Tennessee.

## PARTIES

7.      Plaintiff is a resident of Tennessee who was employed by the Nashville Fire Department, an agency of the Metropolitan Government of Nashville and Davidson County.

8.      Defendant is a local government entity and employer within the meaning of 42 U.S.C. § 12111(5), doing business in Davidson County, Tennessee.

## STATEMENT OF FACTS

9.      Plaintiff was employed as a paramedic with the Nashville Fire Department ("NFD"), an agency of the Metropolitan Government of Nashville and Davidson County ("Metro"). In that capacity, Plaintiff routinely responded to critical incidents involving fatalities, severe injuries, and traumatic scenes, placing him in sustained high-stress and psychologically hazardous conditions.

10.     On or about January 28, 2022, Plaintiff responded to a multi-fatality incident involving the deaths of children. This event, along with Plaintiff's continued exposure to traumatic emergency calls, caused Plaintiff to develop severe and progressively worsening psychological symptoms consistent with post-traumatic stress disorder ("PTSD"), including intrusive recollections, insomnia, anxiety, emotional exhaustion, and suicidal ideation. Although Plaintiff was not formally diagnosed with PTSD until April 26, 2024, his symptoms manifested

long before that diagnosis and were evident—or should have been evident—to NFD shortly after the January 2022 incident.

11. Following this and other traumatic calls, Plaintiff repeatedly communicated to supervisory personnel that he was struggling to cope with the psychological demands of the job. Plaintiff reported emotional distress, difficulty sleeping, anxiety, and an inability to mentally process or handle continued exposure to high-stress calls. He made multiple verbal requests for time off, relief, and mental-health support, including requests intended to allow him to recover from duty-related trauma and continue performing his job safely.

12. At one point, Plaintiff expressed suicidal ideation to a colleague, stating that he "wanted to kill himself." That colleague escalated the concern through NFD's peer-support channels. As a result, supervisory personnel became aware of Plaintiff's condition and met with him. However, rather than initiating any meaningful intervention, accommodation, or referral for evaluation, Plaintiff was given only a brief "pep talk," and no further action was taken.

13. Plaintiff continued to communicate his need for assistance and repeatedly sought relief from the psychological impact of his work. In doing so, Plaintiff also raised concerns regarding NFD's failure to provide adequate behavioral-health resources and its noncompliance with the James "Dustin" Samples Act, a Tennessee statute designed to protect and accommodate first responders suffering from PTSD. Plaintiff advocated for the need for mental-health protections and support for first responders based on his lived experience and the conditions within the department.

14. Despite this repeated notice, Defendant failed to engage in any interactive process or provide reasonable accommodations. Plaintiff's requests for time off and assistance

were denied, and his need for mental-health relief was treated as a burden on staffing rather than a medical condition requiring accommodation. Supervisors referenced concerns about excessive "callouts" and failed to refer Plaintiff to the Department's Behavioral Health Team or any other appropriate resource. Plaintiff's condition was not evaluated, accommodated, or meaningfully addressed.

15. Instead, Defendant began treating Plaintiff's condition as a disciplinary issue. On or about April 15, 2024—after Plaintiff again raised concerns regarding his mental health, requested assistance, and invoked his rights under the James "Dustin" Samples Act—Plaintiff was summoned to an unannounced, command-level meeting attended by multiple supervisory officials, including Chiefs Smith, Haas, Toon, and Bamman.

16. During that meeting, Plaintiff was informed that he was under investigation for alleged documentation irregularities. These allegations had not previously resulted in discipline, had not been formally addressed through standard channels, and were not handled in accordance with NFD's progressive discipline policies. Instead, the allegations were used as a basis for immediate and severe action. At the outset of the meeting, Defendant Fred Smith acknowledged the difficulty of the situation, apologized for the impact on Plaintiff, and commended Plaintiff for his performance, including working overtime, consistently reporting on time, and doing a good job. Despite this acknowledgment of Plaintiff's strong work history, the tone of the meeting shifted abruptly.

17. Plaintiff was then threatened with termination and informed that the matter could be referred to the Tennessee Department of Health for potential licensure consequences, placing his paramedic certification and entire career at risk. Plaintiff was presented with an ultimatum: resign immediately or face termination and potential professional ruin. In response,

Plaintiff sat in disbelief, buried his face in his hands, and stated, "this can't be happening, my mental health cannot deal with this right now." Plaintiff was not given a meaningful opportunity to respond, seek accommodation, or obtain medical evaluation. Despite Plaintiff's explicit statement that his mental health could not withstand the situation, Defendants refused to pause, investigate, or consider any accommodation.

18. Under these coercive circumstances, Plaintiff was compelled to resign. His resignation was not voluntary but was the result of intolerable working conditions and the credible threat of losing his professional license and future employment opportunities.

19. The timing and circumstances of Plaintiff's forced resignation demonstrate that Defendant's actions were not motivated by legitimate performance concerns but were instead driven by Plaintiff's repeated requests for accommodation and his advocacy regarding mental-health protections. Defendant deviated from its normal disciplinary practices and relied on unsubstantiated allegations as a pretext to remove Plaintiff.

20. As a direct and proximate result of Defendants' actions Plaintiff has suffered substantial economic loss, damage to his professional reputation, emotional distress, and the loss of his ability to pursue his career as a paramedic.

## CLAIMS

## COUNT I: ADA FAILURE TO ACCOMMODATE OR ENGAGE IN THE INTERACTIVE PROCESS
### (ADA – 42 U.S.C. § 12112(a))

21.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

22.     The Americans with Disabilities Act prohibits discrimination against a qualified individual on the basis of disability, including an employer's failure to make reasonable accommodations to the known limitations of such individual. 42 U.S.C. §§ 12112(a), (b)(5)(A).

23.     Plaintiff is a qualified individual with a disability within the meaning of the ADA. Plaintiff suffers from post-traumatic stress disorder (PTSD), a mental impairment that substantially limits major life activities including sleeping, concentrating, communicating, and working. Plaintiff was formally diagnosed on April 26, 2024, and exhibited symptoms consistent with PTSD well before that date.

24.     Plaintiff was otherwise qualified to perform the essential functions of his position as a paramedic, with or without reasonable accommodation. Plaintiff continued to perform his job duties while requesting reasonable accommodations, including time off and mental-health support.

25.     Defendant knew or had reason to know of Plaintiff's disability. Plaintiff repeatedly informed supervisory personnel that he was experiencing severe psychological distress related to traumatic calls, requested assistance and time off, and exhibited symptoms—including reported suicidal ideation—that were escalated through internal channels and known to Defendant.

26. Plaintiff requested reasonable accommodations on multiple occasions, including temporary leave and mental-health support, to address his condition and continue performing his job.

27. Defendant failed to provide reasonable accommodations and failed to engage in the interactive process. Instead, Defendant denied Plaintiff's requests, failed to refer him for evaluation or support, and treated his condition as a disciplinary issue.

28. As a direct and proximate result of Defendant's failure to accommodate, Plaintiff's condition worsened, ultimately resulting in his constructive discharge and causing damages including lost wages and benefits, emotional distress, and other compensable harm.

## COUNT II: DISCRIMINATORY DISCHARGE & DISPARATE TREATMENT
(ADA – 42 U.S.C. § 12112(a))

29. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

30. The Americans with Disabilities Act prohibits an employer from discriminating against a qualified individual on the basis of disability with respect to discharge and other terms and conditions of employment. 42 U.S.C. § 12112(a).

31. Plaintiff is a qualified individual with a disability. Plaintiff suffers from PTSD, which substantially limits major life activities, and he was able to perform the essential functions of his position as a paramedic.

32. Defendant knew or had reason to know of Plaintiff's disability. Plaintiff repeatedly informed supervisory personnel of his severe psychological distress related to traumatic calls, requested assistance, and exhibited symptoms—including reported suicidal ideation—sufficient to place Defendant on notice.

33. Defendant subjected Plaintiff to an adverse employment action by constructively discharging him. Plaintiff was summoned to a command-level meeting, confronted with unsubstantiated allegations, threatened with termination and licensure consequences, and presented with an ultimatum to resign or face professional ruin, leaving him no reasonable alternative but to resign.

34. Defendant treated Plaintiff less favorably than similarly situated non-disabled employees. NFD routinely applied progressive discipline, reassignment, or lesser corrective measures to other paramedics and personnel who engaged in far more serious or comparable conduct. Employees with documented criminal conduct, including DUI offenses and domestic-related incidents—even those publicized—were not terminated or forced to resign. Other employees who engaged in inappropriate conduct while on duty, including making offensive remarks or engaging in conduct implicating patient care standards, were permitted to remain employed, often receiving counseling, suspension, or reassignment rather than termination.

35. Similarly, multiple paramedics who failed to follow protocols or committed patient-care errors were demoted rather than discharged. Employees who violated drug policies were later reinstated. Others who engaged in public or controversial speech resulting in discipline were suspended but retained employment. In another instance, an employee arrested on serious criminal charges was neither terminated nor forced to resign, and another employee under investigation for violent criminal conduct was reassigned during the investigation and permitted to resign voluntarily without threat of termination.

36. Despite this pattern of leniency and progressive discipline for non-disabled employees, Plaintiff—after disclosing severe psychological distress and requesting

assistance—was immediately subjected to a command-level disciplinary proceeding, threatened with licensure consequences, and forced to resign.

37. Defendant's stated reasons for its actions were pretextual, and Plaintiff's disability and related requests for accommodation were motivating factors in the decision to force his resignation.

38. As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff suffered damages including lost wages and benefits, emotional distress, and other compensable harm.

**COUNT III: ADA RETALIATION**
ADA 42 U.S.C. § 12203(a)

39. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

40. The ADA prohibits retaliation against an employee for requesting accommodation or opposing disability-based discrimination. 42 U.S.C. § 12203(a).

41. Plaintiff engaged in protected activity by repeatedly informing his supervisors of his severe mental-health condition, requesting time off and assistance, and advocating for mental-health protections for first responders, especially after he learned, in early 2024, of the passage of the James Dustin Samples Act, Tenn. Code Ann. § 7-51-201 et seq., which provides protections for first responders suffering from PTSD.

42. Defendant knew of Plaintiff's protected activity. Plaintiff communicated his condition and requests directly to supervisory personnel, and his peer-reported suicidal ideation was escalated through internal channels, placing Defendant on notice.

43. Defendant subjected Plaintiff to an adverse employment action by constructively discharging him. Plaintiff was summoned to a command-level meeting on or

about April 15, 2024, where Chiefs Smith, Haas, Toon, and Bamman confronted Plaintiff with alleged documentation errors arising from prior patient encounters. The alleged errors were dated and less severe than conduct for which other paramedics were not terminated but instead received lesser discipline. Defendants presented these allegations during the meeting and issued Plaintiff an ultimatum: resign immediately or face termination and potential licensure consequences.

44. The temporal proximity between Plaintiff's protected activity and his forced resignation, along with Defendant's escalation of discipline and reliance on unsubstantiated allegations, supports a plausible inference that Plaintiff's protected activity was a motivating factor in the adverse action.

45. As a direct and proximate result of Defendant's retaliation, Plaintiff suffered damages including lost wages and benefits, emotional distress, and other compensable harm.

## COUNT IV – FIRST AMENDMENT RETALIATION
(42 U.S.C. § 1983)(Monell)

46. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

47. Plaintiff engaged in protected speech by reporting his mental-health concerns, advocating for improved mental-health resources for first responders, and invoking protections under the James "Dustin" Samples Act. In doing so, Plaintiff spoke as a citizen on matters of public concern, including the safety, well-being, and treatment of first responders.

48. Defendants, acting under color of state law, subjected Plaintiff to an adverse employment action that would deter a person of ordinary firmness from engaging in such

speech. On or about April 15, 2024, Plaintiff was summoned to a meeting with Chiefs Smith, Haas, Toon, and Bamman, where he was presented with an ultimatum to resign immediately or face termination and potential licensure consequences. This coercive choice effectively forced Plaintiff's resignation.

49. Plaintiff's protected speech was a substantial or motivating factor in Defendants' actions, as evidenced by the temporal proximity between his speech and the adverse action, as well as the nature and severity of Defendants' response.

50. Defendant Metropolitan Government of Nashville and Davidson County is liable under 42 U.S.C. § 1983 because Plaintiff's constitutional injuries were caused by official policy, custom, and decisions of final policymakers. At all relevant times, the Chief Defendants exercised final decision-making authority with respect to discipline and employment actions within the Nashville Fire Department. Acting within that authority, they made and implemented the decision to force Plaintiff's resignation without any meaningful opportunity for review, appeal, or reconsideration. Under these circumstances, their decision was final and constituted official policy attributable to Metro.

51. In addition, Defendant maintained a practice of selectively enforcing its disciplinary policies by imposing severe discipline on certain employees while permitting other similarly situated employees who engaged in comparable or more serious conduct to receive lesser discipline. Plaintiff was subjected to materially harsher treatment than such employees. This practice was a moving force behind the violation of Plaintiff's constitutional rights.

52. As a direct and proximate result of Defendants' actions, Plaintiff suffered damages including lost wages and benefits, loss of employment opportunities, emotional distress, and other compensable harm.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant and grant the following relief:

53.     Declaratory Relief - Declare that Defendant's conduct violated the Americans with Disabilities Act, 42 U.S.C. §§ 12112(a) and 12203(a).

54.     Injunctive and Equitable Relief

      a. Order Defendant to reinstate Plaintiff to his former position or a substantially equivalent position, with full seniority, benefits, and rights; or, in the alternative, award front pay in lieu of reinstatement where reinstatement is not feasible;

      b. Order Defendant to remove or expunge adverse employment records relating to Plaintiff's forced resignation; and

      c. Enjoin Defendant from engaging in unlawful disability discrimination or retaliation.

55.     Compensatory Damages - Award Plaintiff compensatory damages pursuant to 42 U.S.C. § 1981a(a)(2), including:

      a. Back pay and lost benefits;

      b. Front pay for loss of future earnings; and

      c. Damages for emotional distress, mental anguish, and related non-economic harm.

56.     Attorney's Fees and Costs - Award Plaintiff reasonable attorney's fees, expert witness fees, and litigation costs pursuant to 42 U.S.C. § 12205.

57. <u>Interest</u> - Award prejudgment and post-judgment interest as allowed by law.

58. <u>Other Relief</u> - Grant such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a jury on all issues so triable.

Respectfully submitted,

_____

AARON READ

By: s/Cody Johnson/
TURKLAY LAW, PLLC
CODY JOHNSON
Attorney for Plaintiff
102 East Main St. Suite A
Lebanon, TN 37087
(629) 200-7774
cody@turklaylaw.com

VERIFICATION
I AARON READ, declare that I am the Plaintiff in the foregoing instrument, and the facts stated therein are true and correct to the best of my knowledge and belief, and that the Complaint is not made out of levity or by collusion with the Defendant, but in sincerity and truth for the causes mentioned herein.

_____

AARON READ